M

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED
2018 JUN 11 PM 3:18
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:17-CR-103-M |
| JESSICA LOVE (10) | |

## FACTUAL RESUME

In support of Jessica Love's plea of guilty to the offense in Count One of the indictment, Jessica Love, the defendant, Christopher Lewis, the defendant's attorney, and the United States of America (the government) stipulate and agree to the following:

## ELEMENTS OF THE OFFENSE

To prove the offense alleged in Count One of the indictment, charging a violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347), that is, Conspiracy to Commit Health Care Fraud, the government must prove each of the following elements beyond a reasonable doubt:[1]

*First.* That the defendant and at least one other person made an agreement to commit the crime of healthcare fraud as charged in the indictment;

*Second.* That the defendant knew the unlawful purpose of the agreement; and

*Third.* That the defendant joined in it willfully, that is, with the intent to further its unlawful purpose.

---

[1] *See* Fifth Circuit Pattern Jury Instruction 2.15A (5th Cir. 2015) (Conspiracy to Commit Offense, 18 U.S.C. § 371); *United States v. Njoku*, 737 F.3d 55, 68 (5th Cir. 2013) ("Section 371 requires proof of an overt act, which Section 1349 does not."); *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012) (same).

Factual Resume—Page 1

The elements of Health Care Fraud, a violation of 18 U.S.C. § 1347, are as follows:[2]

*First.*  The defendant knowingly and willfully executed a scheme or artifice to defraud Medicare and Medicaid, health care benefit programs as defined in 18 U.S.C. § 24(b), and to obtain money and property owned by and under the custody and control of Medicare and Medicaid, by means of materially false and fraudulent pretenses, representations, and promises, in connection with payments for health care services, namely hospice services;

*Second.*  That the defendant acted with a specific intent to defraud a health care benefit program;

*Third.*  That the false or fraudulent pretenses, representations, or promises that the defendant used were material; and

*Fourth.*  That the operation of the health care benefit programs affected interstate commerce.

## STIPULATED FACTS

1. Jessica Love admits and agrees that in or around August 2012 and continuing through in or around July 2014, in the Northern District of Texas and elsewhere, she did knowingly, intentionally, and willfully combine, conspire, confederate, and agree with Bradley Harris, Amy Harris, Melanie Murphey, Patricia Armstrong, Mark Gibbs, Laila Hirjee, Syed Aziz, Reziuddin Siddique, Charles Leach, Ali Rizvi, Tammie Little, Jaclyn Pannell, Taryn Stuart, Slade Brown, Samuel Anderson, and others, to knowingly and willfully execute, and attempt to execute, a scheme and artifice: (a) to defraud Medicare and Medicaid, health care benefit programs as defined in

---

[2] Fifth Circuit Pattern Jury Instruction 2.59 (5th Cir. 2015) (Health Care Fraud, 18 U.S.C. § 1347).

18 U.S.C. § 24(b); and (b) to obtain money and property owned by and under the custody and control of Medicare and Medicaid, health care benefit programs as defined in 18 U.S.C. § 24(b), by means of materially false and fraudulent pretenses, representations, and promises, in connection with payments for health care services, namely hospice services, in violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347).

2. Jessica Love worked for Novus Health Services, Inc. and Optim Health Services, Inc. (collectively Novus) from around August 2012 until around July 2014. The two Novus companies were operated as one: both were run from the same office by the same group of employees, and both were providers of hospice services to beneficiaries in the Northern District of Texas.

3. Love's titles at Novus were "Registered Nurse Case Manager" and "Regional Director." Her responsibilities included supervising the Registered Nurses (RN) and Licensed Vocational Nurses (LVN) in her region, liaising between nurses and doctors, physician recruitment, customer service, patient transport, and other tasks as directed by her co-defendant, Bradley Harris, who was the Chief Executive Officer of Novus and her direct supervisor throughout her employment with Novus. Love has been a Registered Nurse since 2006, but was prohibited by the Texas Board of Nursing from working as an RN at a home health or hospice company during her employment at Novus.

4. Love admits that she and co-conspirators defrauded Medicare and Medicaid by (1) admitting patient beneficiaries to Novus hospice service who were not eligible for hospice service, yet billing Medicare and Medicaid for hospice stays and services as if

the beneficiaries were eligible, (2) billing Medicare and Medicaid for hospice services that were either not provided to beneficiaries, were not directed by a doctor or other medical professional as required by Medicare, or were not supported by medical documentation and diagnoses as required by Medicare, and (3) billing Medicare and Medicaid for hospice services for beneficiaries for whom Novus had paid physicians, assisted living facilities, and others for hospice patient referrals. Love knew that purported "medical services" for which Novus billed Medicare and Medicaid were often directed by Bradley Harris. These directions included Bradley Harris's instructing nurses to intentionally overmedicate beneficiaries with medications such as hydromorphone and morphine with the intent to hasten their deaths.

5. Love personally participated in the Novus fraud by (1) recruiting licensed physicians to serve as Novus medical directors with the understanding that the medical directors would be compensated on the basis of how many hospice patient referrals that they provided to Novus, (2) arranging payments to assisted living facilities in exchange for hospice patient referrals, (3) arranging for durable medical equipment such as walkers, wheelchairs, and recliners to be provided to induce potential hospice patients to switch services to Novus, (4) helping falsify a range of documents to perpetuate the Novus fraud, and (5) by collecting unused medications from deceased patients, such as hydromorphone and morphine, storing it in her refrigerator, and then distributing them to other patient beneficiaries to whom the medications had not been lawfully prescribed.

## Defendant Medical Directors Did Not Provide Patient Care

6. When Love first started working at Novus in 2012, Novus RNs would call a newly-admitted beneficiary's medical director to discuss which medications the beneficiary should continue taking. Within months, or by the beginning of 2013, this had changed. The RNs began to contact Bradley Harris instead of the medical directors, and Bradley Harris would decide which medications would be continued. Bradley Harris wanted to make these decisions because he did not want to continue patient beneficiaries on medications—for example, the medication Namenda—that Novus would have to pay for as part of the hospice care for which it billed Medicare and Medicaid.

7. Defendant Mark Gibbs was a Novus medical director. During Gibbs's weekly Interdisciplinary Team, or "IDT," meetings there was little discussion of patient beneficiary declines or stabilization, which meant that Gibbs had little basis to determine whether there had been any change in a beneficiary's end-of-life prognosis. Occasionally, an RN would push for discharge of one of Gibbs's patient beneficiaries from hospice care, but Gibbs would only agree to the discharge if it was approved by Bradley Harris.

## Recruitment of Physicians

8. Love personally participated in the recruitment of several licensed physicians to work as medical directors at Novus. The arrangement that Love and others proposed to the physicians was payment of a medical director salary in exchange for

hospice patient referrals. Love and others told medical director recruits that Novus would pay them a base salary to start, but that pay would increase with hospice patient referrals.

9. Love participated in the recruitment of defendant Charles Leach to Novus as a physician medical director. Love set up an initial meeting attended by Leach, defendant Amy Harris, Love, and another Novus employee. At the meeting, Amy Harris told Leach that if he could refer three hospice patients to Novus each week for the next month, Novus would pay him a medical director salary. The details of the meeting were relayed to Bradley Harris, who then met with Leach individually to finalize the agreement.

10. Love participated in the recruitment of two other licensed physicians, both of whom accepted the same arrangement of referring hospice patients in exchange for medical director salaries. Bradley Harris always met individually with physician recruits to finalize the agreement establishing them as Novus medical directors.

## Patient Referrals from Assisted Living Facilities

11. Love, along with Bradley Harris and others, provided remuneration to assisted living facilities in exchange for hospice patient referrals. In exchange for the referral of patients, Novus paid for Certified Nursing Assistants (CNA) to staff the assisted living facilities, usually providing one CNA for every five to seven patients referred. Novus made this offer to every assisted living facility that Novus worked with.

12. For example, Love and Bradley Harris met with the Director of Nursing at Living Facility A and offered Living Facility A a full-time CNA in exchange for hospice

patient referrals. Living Facility A accepted the offer. As a result, all of the hospice patients at Living Facility A switched to Novus hospice service.

### Kickbacks to Patients

13. In addition to the kickbacks that Novus provided to assisted living facilities and physician medical directors, Love, along with Bradley Harris and others, offered walkers, recliners, wheelchairs, and other durable medical equipment directly to hospice patients in exchange for their switching their hospice services to Novus.

### Falsification of Hospice Face-to-Face Evaluation Forms

14. Love knew that Medicare regulations required that a physician periodically recertify hospice beneficiaries on the basis of a personal, or "face-to-face," evaluation performed by a physician or physician's assistant. Love helped falsify face-to-face forms for defendant Mark Gibbs that Novus used to support claims to Medicare or Medicaid for reimbursement.

15. Typically, Bradley Harris or defendant Melanie Murphey would email Love face-to-face evaluation forms with patient beneficiary names pre-printed on them. Bradley Harris or Murphey would also include factual narratives of the purported face-to-face evaluations and the day on which the evaluations supposedly occurred, which Bradley Harris or Murphey would create by compiling previous nurses' evaluation notes. Love then took the forms to Mark Gibbs. Love would read the narratives to Gibbs while he handwrote the notes from the narratives into the pre-printed face-to-face evaluation forms. Gibbs would then sign the forms. Novus would pay Gibbs $150 for each falsified face-to-face hospice recertification he completed.

## Falsification of C2 Prescription Forms

16. Love used "C2" prescription forms that had been pre-signed by co-conspirator physicians to fill prescriptions for controlled substances such as hydromorphone and morphine.[3] Love would send the prescriptions to a pharmacy, where they would be delivered to other Novus employees and ultimately administered to Novus patient beneficiaries by Love's co-conspirators without any physician supervision or direction. On multiple occasions, Bradley Harris directed Love to have C2 prescriptions filled. Love knew that Bradley Harris was a certified public accountant without any medical licenses. Love knew that when she had the C2 prescriptions filled, she was falsely representing that whichever physician's signature appeared on each form had ordered or written the prescription.

17. In July 2013, Bradley Harris directed Love to have Mark Gibbs sign a blank pad of C2 prescription forms. Love went to Mark Gibbs's office and watched him sign a pad of blank C2 prescription forms that she then delivered to Bradley Harris. Love saw Gibbs sign another pad of blank C2 forms on a separate occasion during one of Gibbs's Novus IDT meetings. Love knew that Bradley Harris required that every Novus medical director provide him with blank C2 prescription forms. Love observed C2 forms that were pre-signed by defendants Laila Hirjee, Syed Aziz, Reziuddin Siddique, and Charles Leach, although she did not see them sign the forms.

---

[3] Love understands that "Schedule II controlled substances" refers to Schedule II controlled substances as defined and regulated by the Texas Controlled Substances Act, which is codified under Chapter 481 of the Texas Health & Safety Code.

## Fraudulent Use of "Continuous Care"

18. Love understood that a hospice care provider could place a beneficiary on "continuous care," or "CC," which meant that the beneficiary could receive around-the-clock care from a licensed nurse or other medical professional. While an RN could initiate CC, they could only do so if they consulted with a physician and obtained a physician's order to place the beneficiary on CC. A licensed vocational nurse, or "LVN," on the other hand, did not have the medical training necessary to make the decision to initiate CC. Medicare paid a higher rate for CC than for "routine" hospice care.

19. Medical directors at Novus were typically not involved in the initiation of CC for Medicare beneficiaries despite the requirement that they do so. Love, along with other RNs, generally made these decisions without any consultation with a physician. If an RN was not available, Bradley Harris sent an LVN to initiate CC on a beneficiary. Bradley Harris first had defendants Patricia Armstrong or Tammie Little, who were both RNs, perform "triage" on the beneficiary over the phone by speaking with the family, the facility, or the non-CC LVN who was present. There were some CC LVNs who were uncomfortable with this arrangement because LVNs could not make change-of-care decisions according to Texas Nursing Board rules. LVNs frequently arrived to care for a beneficiary thinking an RN had examined the beneficiary already or would do so imminently, but this was not the case.

20. Bradley Harris wanted to place Novus hospice beneficiaries on CC as early as possible because Harris wanted to benefit from the higher billing rates for CC compared to routine care. Bradley Harris also used CC to hasten the deaths of

beneficiaries that Harris thought had been on hospice for too long. If a beneficiary was on CC for three or four days without change, Bradley Harris instructed the CC nurses to give more medication to the beneficiary. Bradley Harris ordered an increase in whatever narcotic was being used, generally morphine, Dilaudid (i.e., hydromorphone), or Ativan. If CC nurses were not medicating as Bradley Harris instructed, he replaced them with nurses who would follow his instructions. Bradley Harris ordered these increases in medication because he wanted the beneficiaries to die.

21. Love participated in the overmedication that led to the death of hospice beneficiary J.J. When nurses were not medicating J.J. at the maximum levels that Bradley Harris desired, Harris asked defendant Taryn Stuart (at the time named Taryn Wiggins), whom Love supervised, to relieve the other nurses so that she would "do it right." In a text message between Stuart and Love, Love advised Stuart to "give the Jessica CC orders," which included turning off the beneficiary's oxygen, increasing the Ativan and Morphine, and turning the beneficiary on their left side. Love concluded that this "works like a little charm." Stuart responded that those directions "are the same things I always do when I do cc." After Stuart arrived and she convinced the grandson of the patient beneficiary to allow her to increase the drug dosages, the beneficiary died within five hours. The following day, Stuart texted Love: "ya know, I was thinking. Pt's are sometimes on cc for days before I come in. And they almost always pass before my first shift ends. What does that say about me? Lol." Love responded, "That your [sic] a great cc nurse :)"

22.     Love also participated in the overmedication that led to the death of B.R. Taryn Stuart, who was assigned as B.R.'s CC nurse, ran out of morphine to administer to him. At Bradley Harris's direction, Love brought morphine to Stuart that had previously been prescribed for a different beneficiary, but that Love had retained in her home. Love provided this medication to Stuart without consultation or the approval of a physician. Stuart then used this medication to overmedicate B.R. to the point of death.

### Falsification of "Do Not Resuscitate" Forms

23.     While she was working at Novus, Love observed Mark Gibbs sign a blank "Out-Of-Hospital Do Not Resuscitate Order," or "DNR," at an IDT meeting. A DNR is an agreed doctor's order, signed by both a doctor and hospice beneficiary, in which a hospice beneficiary agrees that, in the event of their incapacitation, they will not be medically resuscitated. Love knew that Texas law required that hospice beneficiary signatures on out-of-hospital DNR forms be either notarized, or signed in the presence of two witnesses who must also sign the order.[4]

24.     Love observed that Bradley Harris and Amy Harris kept blank DNRs that appeared to be pre-signed by both Amy Harris as a notary and Novus's medical directors (one medical director signed each DNR). Amy Harris kept the pre-signed DNRs in a drawer in her office. Novus marketers knew about the pre-notarized, pre-signed DNRs, and would go into Amy Harris's office to get DNRs when they needed them to admit Medicare beneficiaries to Novus hospice service. Love also observed that Bradley Harris

---

[4] Love understands that this rule is codified in Texas Health & Safety Code § 166.082.

Factual Resume—Page 11

or Amy Harris would scan and email the signed and notarized blank DNR forms to nurses or marketers when the nurses or marketers requested them.

25. Love understood that Novus marketers would have beneficiaries sign the pre-notarized DNRs during hospice admission without any physician involvement. Love knew that Bradley Harris required that every patient sign a pre-notarized DNR because if there was no DNR in the home, and the beneficiary called 911 or went to the hospital, Novus would be responsible for all charges related to the emergency remedial care that was used to resuscitate the beneficiary.

## Conclusion

Love agrees that the she committed all the essential elements of the offense. This factual resume is not intended to be a complete accounting of all the facts and events related to the offense charged in this case. The limited purpose of this statement of facts is to demonstrate that a factual basis exists to support Love's guilty plea to Count One of the indictment.

AGREED TO AND STIPULATED on this 11th day of June, 2018.

_____
JESSICA LOVE
Defendant

_____
CHRISTOPHER LEWIS
Attorney for Defendant

ERIN NEALY COX
UNITED STATES ATTORNEY

_____
RUSSELL W. FUSCO
Assistant United States Attorney
Texas State Bar No. 24069743
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Tel: 214-659-8600
Fax: 214-659-8805
Email: russell.fusco@usdoj.gov